# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN
_____

[UNDER SEAL],

                         Plaintiffs,

     v.

[UNDER SEAL],

                         Defendants.

Case No. _____

COMPLAINT


**FILED IN CAMERA AND UNDER SEAL
PURSUANT TO 31 U.S.C. §3730(b)(2)**


## DOCUMENT TO BE KEPT UNDER SEAL

Nola J. Hitchcock Cross
Mary C. Flanner


Cross Law Firm, S.C.
The Lawyers Building
845 N. 11th Street
Milwaukee, WI 53233
Phone: (414) 224-0000
Fax:    (414) 273-7055
njhcross@crossalawfirm.com
mflanner@crosslawfirm.com
www.crosslawfirm.com

Attorneys for [under seal]

1

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES *ex. rel.*
James Mlaker and David Jurczyk,

      Plaintiff-Relators,

      v.

 United Healthcare Services, Inc.,

      Defendant.

Case No. _____

Filed *In Camera* pursuant to
31 U.S.C. § 3730(b)(2)

COMPLAINT for DAMAGES
and INJUNCTIVE RELIEF
Pursuant to 31 U.S.C. § 3730
FEDERAL FALSE CLAIMS ACT

---

### COMPLAINT for DAMAGES and INJUNCTIVE RELIEF
### pursuant to
### 31 U.S.C. § 3730
### FALSE CLAIMS ACT

---

Nola J. Hitchcock Cross
Mary C. Flanner

Cross Law Firm, S.C.
The Lawyers Building
845 N. 11th Street
Milwaukee, WI 53233
Phone: (414) 224-0000
Fax:    (414) 273-7055
njhcross@crossalawfirm.com
mflanner@crosslawfirm.com
www.crosslawfirm.com
Attorneys for Plaintiff Relators
James Mlaker and David Jurczyk

2

**Table of Contents**

I.    INTRODUCTION TO THE FRAUD ................................................................... 5

II.   PARTIES ........................................................................................................ 8

      A.  Defendant ............................................................................................. 8

      B.  Plaintiff Relators .................................................................................. 8

      C.  Government Plaintiff ............................................................................ 8

III.  STATEMENT OF THE CASE ........................................................................ 8

IV.   JURISDICTION AND VENUE ....................................................................... 9

V.    APPLICABLE LAW ...................................................................................... 10

      A.  The Medicare Program ......................................................................... 10

      B.  The Medicare Advantage Program ...................................................... 11

          1. Competitive Bid and Rebate Structure. ......................................... 11

          2. The Contract between the Medicare Advantage Private Insurer and CMS. .......... 12

      C.  The Medicare Advantage Star Rating System ..................................... 13

          1. Star Rating Measures. ................................................................... 13

          2. Star Rating Calculations. .............................................................. 16

      D.  The Affordable Care Act's Quality Bonus Payments .......................... 17

      E.  CMS Star Rating Reductions & Penalties ........................................... 19

          1. CMS Action to Downgrade Plans. ................................................ 19

          2. Intermediate Sanctions. ................................................................ 21

          3. Self-Reporting. ............................................................................. 22

VI.   FACTUAL BACKGROUND .......................................................................... 23

      A.  UnitedHealthcare's Organization, Operations and Procedures ......... 23

      B.  Relators ................................................................................................ 27

          1. David Jurczyk ............................................................................... 27

          2. James Mlaker ................................................................................ 30

          3. Relators' Discovery of the Fraud. ................................................ 30

VII.  FRAUDULENT CONDUCT .......................................................................... 32

      A.  UnitedHealthcare's Fraudulent Scheme to Conceal Data to Obtain Underserved
          Quality Bonus Payments and Avoid Penalties..................................... 32

          1. Fraud Summary. ............................................................................ 32

          2. Importance of Concealed Data and Complaint Investigation Process to CMS'
             Star Ratings and Penalties. ........................................................... 34

          3. To Foster its Scheme of Concealment, UHC Steers Beneficiary Complaints to

3

Itself, Rather than to CMS or State Insurance Commissioners. ................................. 35

    4. The CMS Investigation Process Summary. ........................................... 36

B. UnitedHealthcare's Compliance Program Design ..................................... 37

C. UHC's Complaint Processing. ................................................................. 38

D. Complaint Investigation ......................................................................... 39

E. Self-Reporting to CMS .......................................................................... 40

F. United's Falsification of Star Rating Data Submissions ............................ 42

G. Specific Examples: UnitedHealthCare's Scheme to Conceal "Serious Compliance Issues" Including Violations of Medicare Advantage Enrollment and Marketing Regulations. .......................................................................................... 46

    1. Agent Joseph Medinger ..................................................................... 47

    2. Agent Tina Corpron ........................................................................... 49

    3. Agent Irving Steel ............................................................................. 50

VIII. COUNTS ..................................................................................................... 51

A. Count One ............................................................................................. 51

False Claims Act, 31 U.S.C. § 3729(a)(1)(A)............................................... 51

B. Count Two ............................................................................................. 52

False Claims Act, 31 U.S.C. § 3729(a)(1)(B) Falsification of Material Star Rating Compliance Data ........................................................................................ 52

IX. PRAYER FOR RELIEF .................................................................................. 53

Case 2:16-cv-01429-WED   Filed 10/24/16   Page 4 of 54   Document 1

Plaintiff Relators **James Mlaker** and **David Jurczyk**, through their attorneys, Nola J. Hitchcock Cross and Mary C. Flanner of Cross Law Firm, S.C., on behalf of the **United States of America** and themselves, as and for their complaint against Defendant **United HealthCare Services, Inc**., ( "**UHC**," "UnitedHealthcare" or "Defendant") allege as follows:

## I. INTRODUCTION TO THE FRAUD

1. Since the inception of publicly funded healthcare, policymakers have searched for ways to reduce federal healthcare costs while at the same time improving overall quality of coverage and care. To that end, pursuant to the Patient Protection and Affordable Care Act of 2010, the United States Department of Health and Human Services' Centers for Medicare and Medicaid ("CMS") implemented several programs aimed at tracking vendors' performance and adjusting federal payments accordingly. Pub L. 111-148, 124 Stats. 119-124, codified as amended at 42 U.S.C. § 18031(g).

2. For Medicare Part C, generally known as Medicare Advantage, CMS has implemented the **Quality Bonus Payment** incentive program based on a **Star Rating system,** aimed at increasing the overall quality of *private insurer's* Medicare Advantage Plans by offering potential payment of billions of dollars in incentive reward payments.

3. Among other measures, the Star Rating system is meant to track beneficiary complaints against the Medicare Advantage plans and the integrity of the processing and resolution of such beneficiary complaints.

4. Since 2012, CMS has paid out billions of dollars in Quality Bonus Payments based on a **5-Star Rating** system.

5. The Star Rating system is primarily based on self-reported data by the private

insurers who offer the Medicare Advantage programs. Although there are 47 measures to calculate the Star Rating as discussed in detail below, incomplete or inaccurate reporting is viewed harshly by CMS and may result in a downgrade on the **Star Rating**, penalizing the private insurer by billions of dollars. For example, one of the ratings involves diabetes screening. If a CMS audit confirms that the Medicare Advantage organization has submitted inaccurate or incomplete diabetes screening data, CMS may, on that basis alone, downgrade the plan to a lower **Star Rating**, resulting in a loss of millions or billions of dollars.

6. Likewise, significant "serious" complaints can also lead to downgrading an insurer's Star Rating, resulting in an equally costly downgrade and lowered Star Rating.

7. Defendant has set up a corporate fraud scheme whereby they maintain a dual database on complaints about their plans, rendering a CMS audit ineffective due to the concealed data. The fraudulent concealment results in CMS being unable to fully audit the beneficiary complaints regarding Defendant's Medicare Advantage plans.

8. Further, Defendant singles out "serious" beneficiary complaints to disproportionately conceal them from CMS to avoid being downgraded to a lower Star Rating and thereby lose Millions of dollars.

9. Such concealed data and false self-reporting to CMS, or unauditable fraud, constitutes false claims for government payment of **Quality Bonus Payments** and to avoid *penalties* pursuant to the False Claims Act.

10. **UnitedHealthcare Services, Inc.** provides coverage for more than 70 million individuals. It is by far the largest **Medicare Advantage** private insurer in the United States. **United Healthcare Services, Inc.** is the nation's largest provider of Medicare Advantage plans with over 3.6 million members, or, roughly 21% of all Medicare Advantage enrollees.

6

11. In fiscal year 2016, the United States paid **UnitedHealthcare** $1.4 billion in **Quality Bonus Payments** based on their **3** to **5-Star Ratings**. This **$1.4 billion** was nearly a 300% increase from the **$564 million Quality Bonus Payment** paid by the United States to Defendant UnitedHealthcare, Inc. in fiscal year 2015.

12. United Healthcare also intended to provide further false billings to the government by falsely Medicare steering beneficiaries to maintain or commence a Medicare Advantage plan from Defendantbased on these fraudulently obtained **Star Ratings**, further enhancing Defendant's revenues by additional billions of dollars of government payments and avoidance of penalties.

13. Defendant incentivizes itsofficers and managers to perpetuate the dual complaint database fraud by paying them bonuses related to the number of beneficiaries in their plans.

14. **UnitedHealthcare** has formally noted that the stakes for maintaining **3-5-Star Ratings** are very high. In its most recent 10-K report to the United States Securities and Exchange Commission ("SEC"), its shareholders and the public, Defendant reported in its financial disclosure notes:

> "If we do not maintain or continue to improve our star ratings, our plans may not be eligible for quality bonuses and we may experience a negative impact on our revenues and the benefits that our plans can offer, which could materially and adversely affect our membership levels, results of operations, financial position and cash flows."

15. Through its fraud, described in detail below, **UnitedHealthcare** has attempted to insure that it does in deed "maintain or continue to improve" its **Star Ratings** to be eligible for the highest level of **Quality Bonus Payments** based on the government's **Star Rating** incentive program which Defendant has fraudulently obtained through falsified self-reporting and concealed beneficiary complaint data.

7

## II.     PARTIES

### A.  Defendant

16.     **United HealthCare Services, Inc**. is a subsidiary of United Health Group, Inc., a Delaware corporation with its home office in Minnetonka, Minnesota. The incorporator is Dannette L. Smith, whose address is 9900 Bren Road East, Minnetonka, Minnesota 55343. UnitedHealth Group's registered agent is The Corporation Trust Company at the Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801. UHC is registered in Wisconsin as a foreign corporation with its registered agent as C T Corporation System, 8020 Excelsior Dr. Ste. 200 Madison , WI 53717.

### B.  Plaintiff Relators

17.     **James Mlaker** is a resident of the City of Milwaukee, Milwaukee County, and state of Wisconsin.  He has been employed by **UHC** as a Wisconsin insurance plan Sales Representative in the Community & State Division since September 2011.

18.     **David Jurczyk** is a resident of the Town of Watertown, Jefferson County, state of Wisconsin.  He has worked for **UHC** since 2003, initially as a Sales Representative in the Community & State Division and, after a promotion in 2009, as a Sales Manager in the Community & State Division in Wisconsin.

### C.  Government Plaintiff

19.     James Mlaker and David Jurczyk bring this action on behalf of the **United States of America** pursuant to 31 U.S.C. §3730(b)(1) and on their own behalf.

## III.     STATEMENT OF THE CASE

8

20.     The False Claims Act ("FCA") prohibits, *inter alia*: (a) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; (c) conspiring to knowingly present or cause to be presented to the federal government a false or fraudulent claim for payment or approval; and (d) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government. 31 U.S.C. §§3729(a)(1)(A)-(C), and (G).

21.     Any person who violates the FCA is liable for a civil penalty of up to $21,563 for *each* violation, plus three times the amount of the damages sustained by the United States, plus reasonable attorneys' fees and costs. 31 U.S.C. §3729(a)(1) and 3730(D)(4).

22.     Defendant submits fraudulent data to the Government in order to obtain higher **Quality Bonus Payments** and avoid penalties for their Medicare Advantage plans.  The consequences to the public fisc run into Billions of dollars.

23.     Relators seek to recover on behalf of the United States and themselves for damages and civil penalties arising from fraudulent and improper claims for payment that Defendant submitted or caused to be submitted through their Medicare Advantage contracts with the United States government.

## IV.     JURISDICTION AND VENUE

24.     This Court has jurisdiction over the subject matter of this action pursuant to both 28 U.S.C. §1331 and 31 U.S.C. § 3370, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §3730.

25.     The Court has personal jurisdiction over United HealthCare Services, Inc. pursuant to 31 U.S.C. § 3732(a) which authorizes nationwide service of process, and because facilities and personnel involved in this matter are located in this district and data collected at that location were falsely provided to the government.

26.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Defendant conducts business in this district.

27.     In addition to other oral and written notification to the government, on October 17, 2016, Relators provided a draft of this complaint to the United States Department of Justice and participated in a pre-filing review and discussion of the draft complaint on October 19, 2016.

28.     Relators also provided the United States Attorney General, the United States Attorney for the Eastern District of Wisconsin, and the Wisconsin Attorney General with disclosure materials prior to filing the Complaint.

## V.     APPLICABLE LAW

### A.  The Medicare Program

29.     Medicare is a federally funded health insurance program for the elderly created in 1965, when Title XVIII of the Social Security Act was adopted. Pub. L. No. 89-97, 79 Stat. 286 (codified as amended at 42 U.S.C. §§ 1395-11395lll).

30.     Medicare has multiple parts:

a)  Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services, hospice services and related care.

b)  Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of physicians' services and outpatient diagnostic tests.

10

c)  Medicare Part C, the Medicare Advantage program, covers both Part B and C and can cover additional services through plans administered by private insurance companies.

d)  Medicare Part D, the Medicare Prescription Drug Benefit, covers the costs of prescription drugs and is also available as part of Part C Medicare Advantage plans.

## B. The Medicare Advantage Program

### 1. Competitive Bid and Rebate Structure.

31.     Since the 1970s, Medicare beneficiaries have had the option under various programs to obtain Medicare benefits through privately managed capitated-fee health plans as an alternative to the traditional "fee-for-service" Medicare. The program became known as Medicare Part C, or **Medicare Advantage** in 2003 when the Medicare Prescription Drug Improvement and Modernization Act added the optional Medicare Prescription drug benefit, or Medicare "Part D." 42 U.S.C. §§ 1395w-21 to 1395w-29 (Part C) *and* 1395w-101 to 1395w0154 (Part D).

32.     To be eligible for a Medicare Advantage plan, a beneficiary must be eligible for Part A, enrolled in Part B, not be disqualified for having end-stage renal disease, and reside within the plan's service area or within an arranged continuation area. 42 C.F.R. § 422.52.

33.     Insurance organizations selling Medicare Advantage plans, such as Defendant, must submit competitive bids to CMS (42 C.F.R. § 422.254) that are calculated and prepared based on the number and types of individuals enrolled. 42 C.F.R. § 422.256.

34.     Eligible bids are compared to pre-determined "benchmark" amounts reflecting the maximum amount CMS will pay a plan in a given county.

35.     If an insurer's bid is higher than the benchmark, enrollees pay the difference between the benchmark and the bid in the form of a monthly premium, in addition to the Medicare Part B premium. 42 C.F.R. § 422.258.

36.     If the bid is lower than the benchmark, the Medicare Advantage insurer and Medicare split the difference between the bid and the benchmark. The insurer's share of this split is known as a "**Rebate**." 42 C.F.R. § 422.258.

37.     The **Rebate** cannot contribute to the private insurer's profit.  Instead, a **Rebate** must be used by the insurer to provide additional benefits or reduced costs to enrollees. 42 C.F.R. § 422.258. The amount, structure, and source of the governments' payments to Medicare Advantage organizations are governed by 42. C.F.R. Part 422, subpart. G.

**2.  The Contract between the Medicare Advantage Private Insurer and CMS.**

38.     Companies that sell Medicare Advantage plans must meet certain requirements embodied in Chapter 42 Part 422 *et seq.* of the Code of Federal Regulations before enrolling individuals in the plans and subsequently submitting their competitive bids.

39.     The contract between the Medicare Advantage insurer and CMS includes a provision whereby the insurer "agrees to comply with all the applicable requirements and conditions set forth in this part as general instructions [by CMS]," including the requirement that the insurer "comply with the reporting requirements § 422.516 and the requirements in § 422.310 for submitting data to CMS." 42 C.F.R. 422.504(a)(8).

40.     These reporting requirements give CMS broad authority in requesting "all data that are used in development and application of risk adjustment payment model" and provide that CMS may issue "penalties for submission of false data." 42 C.F.R 422.310(a)(e). CMS annually issues updated Medicare Advantage reporting requirements as well as the rules and sources of

12

**Star Rating** measure data in the "Technical Notes" and "Technical Specifications" documents respectively.

### C. The Medicare Advantage Star Rating System

#### 1. Star Rating Measures.

41.　　CMS attempts to measure beneficiaries' experiences with their health plans by giving each plan and Medicare Advantage contract a **Star Rating**. A given contract's Star Rating is based on different criteria, such as the percentage of plan members who had their Body Mass Index calculated or what percentage of female plan members received mammograms during the past two years. There are currently 46 criteria, or "measures" that factor into the Star Rating, 32 specific to Part C (C1-C32) and 15 specific to Part D prescription drug plans (D1-D15).

42.　　In 2008, CMS began using a **5-Star Rating** system as a way of informing beneficiaries of the relative quality of the various Medicare Advantage plans and helping them choose between plans. Ratings are set at the Medicare Advantage contract level, that is all plans under the same contract receive the same score, calculated by averaging the **Star Ratings** for each of *47 individual measures*.

43.　　The individual measures are determined by CMS using data obtained pursuant to the data collection analysis and reporting requirements of the statutory Medicare Advantage "ongoing quality improvement program" required by all Medicare Advantage Organizations under 42 U.S.C 1395w-22(e). Pursuant to 42 C.F.R. 422.258(d)(7): "The quality rating for a plan is determined by the Secretary according to a 5–Star Rating system (based on the data collected under section 1852(e) of the Act.").

44.　　CMS defines and organizes the individual **Star Rating** measures based on CMS's "Three Aims: (1) better care, (2) healthier people/healthier communities, and (3) lower costs

13

through improvements."

45. With this mission statement as its starting point, CMS places each of the 47 **Star Rating** measures into the following five broad categories:

    a. Outcome measures: focus on improvements to a beneficiary's health as a result of the care provided.

    b. Intermediate outcome measures help move closer to true outcome measures. Controlling Blood Pressure is an example of an intermediate outcome measure where the related outcome of interest would be better health status for beneficiaries with hypertension.

    c. Patient experience measures represent beneficiaries' perspectives of the care they received.

    d. Access measures reflect issues that may create barriers to receiving needed care. Plan Makes Timely Decisions about Appeals is an example of an access measure.

    e. Process measures capture the method by which health care is provided.

CMS, *Medicare 2016 Part C & D Star Rating Technical Notes*, 1 (April 5, 2016).

46. "Complaints about the Health Plan" fall into the "patient experience" category.

47. The measures are further subdivided into nine (9) "domains." Five (5) of the domains pertain to Part-C-only Medicare Advantage plans, while (4) four domains pertain to the Part D component of Medicare Advantage plus Part D ("MA-PD") plans. The nine (9) domains and the number of individual measures within them are as follows:

| MA | Domain | Number of Measures |
|---|---|---|
| Part C | #1 Staying Healthy: Screenings, Tests & Vaccines | 7 (C01 - C07) |

14

| Part C | #2 Managing Chronic (Long-Term) Conditions | 12 (C08 - C19) |
|--------|---------------------------------------------|----------------|
| Part C | #3 Member Experience with Health Plan | 6 (C20 - C25) |
| Part C | #4 Member Complaints and Changes in the Health Plan's Performance | 4 (C26 – C29) |
| Part C | #5 Health Plan Customer Service | 3 (C30 – 32) |
| Part D | #1 Drug Plan Customer Service | 3 (D01 – D03) |
| Part D | #2 Member Complaints and Changes in the Drug Plan's Performance | 4 (D04 – D07) |
| Part D | #3 Member experience with the Drug Plan | 2 (D08 – D09) |
| Part D | #4 Drug Safety and Accuracy of Drug Pricing | 6 (D10 – D15) |

48. "Complaints about the Health Plan" are the C26 measure and "Beneficiary Access and Performance Problems are the C28 measure.

49. Each of the 47 individual measures are calculated and weighted differently, using data from one of three (3) general sources:

    a. Administrative data collected by CMS reflecting general plan quality and member satisfaction; complaints, and compliance measures.

    b. Consumer Assessment of Healthcare Providers and Systems ("CAHPS"): a comprehensive and evolving family of surveys that ask consumers and patients to evaluate the interpersonal aspects of health care.

    c. Healthcare Effectiveness Data and Information Set ("HEDIS"): a set of performance measures widely used in the managed care industry and developed and maintained by the National Committee for Quality Assurance ("NCQA").

    d. The Health Outcome Survey ("HOS"): patient-reported health outcomes intended to gather valid, reliable, clinically meaningful health status data.

CMS, *Medicare 2016 Part C & D Star Rating Technical Notes*, 1 (April 5, 2016).

50.     "Complaints about the Health Plan" and "Beneficiary Access and Performance Problems" are measures based on data derived from "administrative data" collected by CMS.

**2. Star Rating Calculations.**

51.     The data for each measure is converted into a **Star Rating** from 1 to 5 stars, with 1 being the worst and 5 being the best. This conversion is done using one of three calculations:

a.  <u>Clustering</u>: This algorithm is used to calculate the Star Rating for the majority of the measures, including operational, procedural, and clinical care measures that fall under different domains. Data is entered into the algorithm, which identifies "gaps" in the data and generates four "cut points" from which the 5 star categories are determined.

b.  <u>Relative Distribution and Significance Testing</u>: This method is used to determine Star Rating cut points for CAHPS survey measures based on survey score percentiles. For example, 5 Star Rating measures are those above the 80th percentile of the relevant CAHPS score.

c.  <u>Fixed Cut Points</u>: This method is unique to C28, the Beneficiary Access and Performance Problems ("BAPP") measure. Each contract begins with a score of 100 equal to 5 stars for this measure, and set value deductions are then subtracted in multiples of 20 to reflect a lower star rating.

52.     Once each of the 47 individual measures has received a **Star Rating**, a domain level **Star Rating** is determined as an unweighted average of each domain's respective measures.

53.     Next, the overall **Star Rating** for a Medicare Advantage contract is calculated as

a weighted average of all the individual measures for each plan under the contract. Individual measures' **Star Ratings** are multiplied by the applicable weight, added together, and then divided by the sum of the respective weights.

54.     The weight assigned to each measure depends on the measures' "weighting category." For example, of the thirty-two (32) Part C measures, fifteen (15) are categorized as "Process Measures" and receive the least weight, which is "1" or 100%. Process measures include most of Part C Domains 1 and 2 measures, including basic health information obtained from HEDIS and CAHPS.

55.     Eight (8) measures categorized as "Patients' Experience and Complaint Measures" (C20 – C27) and three (3) measures categorized as "Measures Capturing Access" receive 150% weight while five (5) measures categorized as either "Outcome" or Intermediate Outcome" measures (C04 – C05, C15 – C16, C19) receive 300% or three (3) times as much weight as process measures.

56.     A single measure categorized as the health plan "Improvement Measure" (C29) is given the most weight, 500%, and is calculated as a comparison of the plans' unweighted average **Star Ratings** for certain measures in the previous year to the present.

57.     Plans generally receive 1 or 2 Stars for the Improvement Measure if, on average, the scores declined; 3 Stars if they stayed about the same; and 4 or 5 Stars if they improved. CMS, *Medicare 2016 Part C & D Star Rating Technical Notes*, 43-44, Attachment I (April 5, 2016).

58.     CMS updates the **Star Ratings** every fall and spring and on the Medicare plan finder website for consumers.

**D.  The Affordable Care Act's Quality Bonus Payments**

59.     Prior to the passage of the Affordable Care Act in 2010, the Medicare Advantage **Star Ratings** served merely as a tool for consumers. Beginning in 2012, however, the **Star Ratings** have served as the primary way of determining Medicare Advantage Organizations' eligibility for billions of dollars in "performance bonuses." *See* Pub L. 111-148, 124 Stat. 447-450 *and* Pub. L. 111-152, 124 Stat. 1043- 44

60.     The Medicare Advantage performance bonuses, known as the **Quality Bonus Payments** incentive program, began as part of the Affordable Care Act's overhaul of the Medicare Advantage payment formulas, as an attempt to reduce federal spending, and better align the costs of Medicare Advantage with the costs of traditional Medicare.

61.     The Congressional Budget Office estimated that the changes made by the Affordable Care Act to Medicare Advantage payment formulas would reduce federal Medicare Advantage spending by $156 billion between 2013 and 2014. Douglas W. Elmendorf, letter to Speaker John Boehner (R–OH), July 24, 2012, pp. 13–14,

http://www.cbo.gov/sites/default/files/cbofiles/attachments/ 43471-hr6079.pdf  (accessed September 25, 2016).

62.     These spending cuts were facilitated by the Affordable Care Act's alteration of the way Medicare Advantage benchmark payments are calculated:  under the Affordable Care Act, benchmark payments are no longer based on the previous year's Medicare Advantage costs. Rather, they are calculated as a percentage of per capita fee-for-service spending. Counties are divided into quartiles with a fee-for-service multiplier of 95%, 100%, 107.5%, or 115%. Counties with the highest fee-for-service spending use the lowest fee-for-service percentage to determine the benchmark and *vice versa*.

63.     Alongside this overall reduction in Medicare Advantage benchmarks, the

Affordable Care Act required CMS to issue **Quality Bonus Payments** for Medicare Advantage

plans that received 4 or more Stars. These bonus payments, referred to in the statue as

"percentage quality increases," were to be calculated as a share of the Medicare Advantage

benchmarks of 1.5% in 2012, 3.0% in 2013, and 5.0% in 2014 and thereafter. 42 U.S.C. 1395w-

23(o).

64.     The bonuses were thus ultimately paid in the form of **Rebates**, which the plans

were required to spend on "extra benefits," such as eyeglasses or transportation to and from the

doctor, to the plans' enrollees, but not to contribute to profit.

65.     A general description of the ACA's **Quality Bonus Payment** program is as

follows:

| Plan Rating | Bonus Payment | New Benchmark | Rebate Payment |
|---|---|---|---|
| 4.5 & 5 Stars | 5% | 105% of Benchmark | 70% |
| 4 Stars | 5% | 105% of Benchmark | 65% |
| New Plans | 3.5% | 103.5% of Benchmark | 65% |
| 3.5 Stars | None | Benchmark | 65% |
| 3 or Fewer Stars | None | Benchmark | 50% |
| Plans Not Reporting | None | Benchmark | 50% |

66.     However, CMS expanded the **Quality Bonus Payment**s to all plans with a **Star

Rating** of at least three (3) Stars. Implemented from 2012 to 2014 under CMS's authority to

conduct "demonstrations," the three-year "QBP demo" resulted in $10.9 billion in *additional*

**Quality Bonus Payments** by CMS to Medicare Advantage organizations. These bonus

payments were paid on per member/per plan basis and are two parts: 1) direct bonus payments to

plan operators; and 2) enhanced Medicare Advantage rebates.

**E. CMS Star Rating Reductions & Penalties**

   **1. CMS Action to Downgrade Plans.**

67.     Due to the enormity of the Quality Bonus Payments tied to Star Ratings, CMS

19

includes a method to reduce Star Ratings in its annual Star Rating Technical Notes procedures for the "Handling of Biased, Erroneous and/or not Reportable Data." CMS, *Medicare 2016 Part C & D Star Rating Technical Notes*, 3, (April 5, 2016).

68.    Under these procedures, "CMS's policy is to reduce the contract's measure rating to 1 star…if it is identified that biased or erroneous data have been submitted by the plan…." CMS, *Medicare 2016 Part C & D Star Rating Technical Notes*, 3, (April 5, 2016).

69.    Thus, monetary incentives are meant to encourage Medicare Advantage Organizations to design, implement, investigate and maintain compliance with sophisticated formal data collection and complaint processing program, since even inadvertent bias or errors can have serious consequences.

70.    Examples of Medicare Advantage organization conduct that would result in a measure's reduction to 1-star include mishandling of data, inappropriate processing, or implementation of incorrect practices such as:

    a.   a contract's failure to adhere to CMS reporting requirements;

    b.   a contract's errors in processing coverage determinations, organizational determinations, and appeals;

    c.    a contract's failure to adhere to CMS-approved point-of-sale edits;

    d.   compliance actions taken against the contract due to errors in operational areas that would directly impact the data reported or processed for specific measures; and

    e.   a contract's failure to pass data validation directly related to data reported for specific measures.

71.    There is no minimum number of cases required for a contract's data to be subject

to CMS "integrity reviews."

72.     In addition to the downgrade of individual measures, erroneous or incomplete **Star Rating** data can have devastating consequences on the overall **Star Rating** of the Medicare Advantage **contract** whenever a plan is subject to an "intermediate sanction."

73.     From 2012 to March 31, 2016**, CMS** would *automatically* reduce the **Star Ratings** of *sanctioned* contracts to 2.5 stars, per the referenced Jennifer Shapiro memo.

74.     Effective March 31, 2016, CMS changed the automatic reduction-upon-sanction policy to a discretionary policy after considering concerns raised by the Medicare Advantage Organizations as well as the fact that nearly 50% of Medicare Advantage contracts had achieved **4-Star Ratings** and reduction of these plans to 2.5 Stars would have drastic financial consequences in terms of lost **Quality Bonus Payments**.

**2.   Intermediate Sanctions.**

75.     Intermediate sanctions, which can result not only in **Star Rating** reduction, but also in *suspension* of Medicare Advantage contract enrollment and marketing, are imposed by CMS for a number of reasons, including failure to provide necessary items and services required under the law and/or contract; imposition of excessive premiums, misrepresentation or falsification of information furnished to CMS or individuals; or enrollment of an individual in any Medicare Advantage plan without the prior consent of the individual. 42 C.F.R. 422.752.

76.     For example, on January 21, 2016 CMS imposed intermediate sanctions on 22 of Cigna-HealthSpring's Medicare Advantage contracts for several violations of 42 C.F.R. Part 422 and Part 423, including "failure to comply with CMS requirements regarding Part C and Part D…**compliance program effectiveness**." (Emphasis added).

77.     Thus, even with the March 2016 shift to discretionary reductions, financial

Case 2:16-cv-01429-WED   Filed 10/24/16   Page 21 of 54   Document 1

analysts estimate that between $180 and $350 million in Cigna **Quality Bonus Payments** remain "at risk." Bob Herman, Anthem, "Cigna Enjoys Stock Boost After Medicare Advantage Change," Modern Healthcare (March 10, 2016),

http://www.modernhealthcare.com/article/20160310/NEWS/160319993.

78.     The most recent example of a Star Rating downgrade illustrates how even "civil money penalties"—a generally less severe enforcement mechanism that can be brought in conjunction with or in lieu of an intermediate sanction— imposed under 42 C.F.R. 422.752 can have a dramatic impact on MA Star Ratings. On October 12, 2015, Humana Inc. announced that approximately 37% fewer Humana MA plan members would be enrolled in plans rated 4 stars or higher in 2018 as a result of recent Star Rating downgrades, causing Humana's stock to fall 5%. Anne Steele, *Humana Sees Potential Fallout From Lower Medicare Star-Rating Report*, WALL ST. J., Oct. 12, available at  http://www.wsj.com/articles/humana-sees-potential-fallout-from-lower-medicare-star-rating-report-1476284660.

79.     According to Humana, the downgrade was the result of a $3.2 million civil money penalty imposed by CMS December 29, 2015 for regulatory violations uncovered in a 2015 CMS audit, including systemic failure to properly process enrollees' grievances such that enrollees could not properly exercise their "right to contact their plan sponsor to express general dissatisfaction with the operations, activities, or behavior of the plan sponsor…."  The penalty resulted in an automatic downgrade of three of the 47 Star Measures, including the C28 measure "Beneficiary Access and Plan Performance."

**3.  Self-Reporting.**

80.     The **Quality Bonus Payment** amounts are determined exclusively by the Medicare Advantage Plan's **Star Rating**, a five-point relative quality measure determined in

22

large part by *self-reported data* purporting to reflect quality of care, coverage, plan administration, and regulatory compliance. Four and five-star plans receive the largest Quality Bonus Payments, while plans below three stars are ineligible for bonuses.

81.     The self-reporting is so crucial to the **Star Rating** incentive system that CMS may automatically downgrade to one-star measure rating in response to any fraudulently submitted data.  CMS, Medicare 2016 Part C & D Star Rating Technical Notes, 3, April 5, 2016.

82.     Prior to 2016, the imposition of a health plan sanction for failure to comply with Medicare regulations resulted in an automatic downgrade to a 2.5-star overall contract rating. Memorandum from Jennifer Shapiro, CMS Acting Director, to All Medicare Advantage Organizations and Part D Plan Sponsors (March 8, 2016) available at http://benefitslink.com/src/cms/CMS-ratings_memo-03082016.PDF (announcing CMS policy change).

83.     Material regulatory violations, which include attempts to falsely inflate or maintain Star Ratings, may disqualify Medicare Advantage Organizations like UnitedHealthcare from receiving **Quality Bonus Payments** at all, as well result in civil money penalties of up to $25,000 for each violation pursuant to 42 C.F.R. § 422.760.

## VI.     FACTUAL BACKGROUND

### A. UnitedHealthcare's Organization, Operations and Procedures

84.     **UnitedHealth Group** ("UHG") is the nation's largest managed healthcare company and Medicare Advantage Organization and the nation's sixth largest corporation overall by revenue, with a 2015 operating income of $11 billion.

85.     Defendant **United HealthCare Services, Inc**. (hereinafter "UHC")  is a Managed

23

Health Organization that contracts, through subsidiaries including **UHC-WI** and all other state and regional subsidiaries, with CMS to provide Medicare Advantage insurance plans throughout the United States. CMS pays Defendant a dollar amount on a per member per month basis, pursuant to complex market-specific payment formulas described in part below as well as pursuant to Medicare Advantage plans' **Star Ratings**.

86. As a diversified managed healthcare company, UHG offers a wide spectrum of healthcare products and services through its two largest subsidiaries, UHC and Optum.

87. Optum constitutes UHG's Health Services platform for coordinating with UHC plans and providers and providing services including population health management; software and information technology products; and pharmacy services.

88. **UHC** is UHG's Health Benefits subsidiary for marketing and managing hundreds of different health insurance plans and is the result of a large-scale reorganization undertaken by UHG to consolidate various healthcare plans and combine them under the unified **UHC** brand.

89. UHG's operations are further divided among over 300 subsidiaries. Because the insurance industry is largely state-regulated and because UHC contracts with state Medicaid program for some of its MA plans, many of these subsidiaries operate incorporated in the state where the members of UHC's healthcare plans reside. However, UHC employs the sales and compliance staff at each of its regional locations and UHC regional and corporate management make all decisions pertinent to sales and compliance.

90. For example, Relators are employed by **UHC** but are based in Wisconsin where UHC markets MA dual-eligible plans through **UnitedHealthcare of Wisconsin, Inc**., a wholly owned subsidiary of **UHC,** that is incorporated in the state of Wisconsin.

Case 2:16-cv-01429-WED   Filed 10/24/16   Page 24 of 54   Document 1

91. UHC also owns and operates numerous other subsidiaries for the sale and services of certain Medicare Advantage plans: UnitedHealthcare of Alabama, Inc., UnitedHealthcare of Arizona, Inc., UnitedHealthcare of Arkansas, Inc., UnitedHealthcare of Colorado, Inc., UnitedHealthcare of Florida, Inc., UnitedHealthcare of Georgia, Inc., UnitedHealthcare of Illinois, Inc., UnitedHealthcare of Kentucky, Inc., UnitedHealthcare of Louisiana, Inc., UnitedHealthcare of Mississippi, Inc., UnitedHealthcare of New England, Inc. (incorporated in Rhode Island); UnitedHealthcare of New Mexico, Inc., UnitedHealthcare of New York, Inc., UnitedHealthcare of North Carolina, Inc., UnitedHealthcare of Ohio, Inc., UnitedHealthcare of Oklahoma, Inc., UnitedHealthcare of Oregon, Inc., UnitedHealthcare of Pennsylvania, Inc., UnitedHealthcare of Texas, Inc., UnitedHealthcare of the Mid-Atlantic, Inc., (incorporated in Maryland); UnitedHealthcare of the Midlands, Inc. (incorporated in Nebraska), UnitedHealthcare of the Midwest, Inc. (incorporated in Missouri), UnitedHealthcare of Utah, Inc., and UnitedHealthcare of Washington, Inc.

92. **UHC's** health plan products are generally organized into four interrelated UHC divisions that develop, market, sell, administer, and manage private and publicly funded health insurance plans: 1) Employer & Individual, 2) Medicare & Retirement, 3) Community & State, and 4) Military & Veterans.

93. **UHC**'s **Employer & Individual Division** markets health insurance plans to large national employers, public-sector employers, small business and individuals.

94. **UHC's Medicare & Retirement Division** provides Medicare plans, Medicare Advantage plans, Medicare Par D prescription drug plans, Medicare supplemental plans, and special needs plans. This division is UHC's largest source of revenue, bringing in over $14 billion between March 2015 and March 2016, according to its most recent quarterly report.

Case 2:16-cv-01429-WED   Filed 10/24/16   Page 25 of 54   Document 1

95.     Because members of plans administered and/or sold by UHC's other three divisions may also be Medicare beneficiaries, **UHC's Medicare & Retirement Division** coordinates with each division and is primarily responsible for the Medicare and Medicare Advantage plans, marketing materials.

96.     **UHC's Community & State Division** markets and administers Medicaid and Medicare Advantage plans including dual eligible special needs plans.

97.     **UHC's Military & Veterans Division** markets and administers TRICARE plans for eligible United States military personnel, retirees, and their dependents in TRICARE's West Region.

98.     **UHC**, through its **Military & Veterans Division** and its **Community & State Division**, offers four basic types of Medicare Advantage health insurance plans:

    a.   Health Maintenance Organization ("HMO") plans: provide typical coverage through a network of coordinating local providers;

    b.   Point-of-Service ("POS") Plans:  allow members to receive certain services from doctors or hospitals that are not in the plan's network, generally at a higher co-payment;

    c.   Preferred Provider Organization ("PPO") Plans: allow members to visit providers who are in or out of network, with higher co-payments when out of network; and

    d.   Private Fee-for-Service ("PFFS") Plans: can be network or non-network, but UHC only provides non-network coverage for PFFS. Members are free to use any Medicare-eligible doctor or hospital who agrees to accept the plan's terms.

26

99.     All four types of plans are subject to the **Star Rating** and evaluated by CMS for eligibility in the **Quality Bonus Payment** program.

100.     **UHC** distributes its insurance products through direct sales as well as through an extensive network of external, independent insurance "brokers" and internal, "captive" insurance "agents." Internal agents, such as Plaintiff-Relator **Mlaker**, are salaried **UHC** employees and generally possess a more in-depth understanding of not only plan coverage but also the overall administration of **UHC** health plans, because unlike independent brokers, **UHC** agents exclusively sell and **UHC** healthcare plans, including Medicare Advantage plans.

101.     Although agents and brokers differ in that only the former are salaried employees of **UHC**, both generally sell the same types of **UHC** plans described above, receive a commission, and are governed by the same set of state and federal marketing regulations.

### B. Relators

#### 1. David Jurczyk

102.     Plaintiff Relator **David Jurczyk** is a Medicare Special Needs Plan Sales Manager for **UHC's** Wisconsin-based Community and State Division, as he has been since April 2009.

103.     With a Bachelor's degree in Business Administration, Management, and Marketing from Prairie State College in Chicago, Illinois, Jurczyk began his career in insurance sales management in 1999 as Field Manager for Royal Neighbors of America's Wisconsin-based life insurance agents.

104.     In 2003, Jurczyk joined **UHC** as a Sales Representative marketing **UHC** Medicare Part C Medicare Advantage plans.

105.     In 2006, Jurczyk accepted a Medicare Sales & Marketing Manager position at Independent Care Health Plan, known as iCare, in Milwaukee, Wisconsin.

106.     Jurczyk was primarily responsible for growing iCare's fledgling Medicare Advantage business. Specifically, Jurczyk developed from scratch a Medicare Advantage prescription drug plan for dual-eligible beneficiaries with Special Needs. In this role, Jurczyk worked closely with CMS and with Wisconsin insurance and health care regulators; oversaw the expansion of the plan from one to seven (7) counties; hired internal agents; contracted with external independent brokers; and coordinated with county-level agencies, including the Milwaukee Department of Aging, Milwaukee Housing Authority, and the Aging and Disability Resource Centers.

107.     Returning to **UHC** in 2009 as a UHC Medicare Special Needs Plan Sales Manager in the **UHC Community & State Division**, Jurczyk oversees a team of approximately six (6) internal **UHC** Sales Agents.

108.     In addition to implementing marketing strategies, monitoring sales data, and coordinating community outreach efforts, Jurczyk's duties include serving as the primary intermediary between individual Sales Agents and the **UHC Compliance Department** when individual Agents are accused by customers of fraudulent sales practices or other forms of noncompliance.

109.     After UHC receives a complaint about an agent's marketing practices, Jurczyk interacts and corresponds with the Agent, **UHC** investigators, and upper-level management in **UHC's Compliance Department** throughout the investigative and disciplinary process.  He often responds to "coaching requests", known as "CRs", to ensure that Agents under his management comply with the Medicare Advantage regulations, depending on the infraction as described in detail below.

110.     As a Sales Manager, as part of his regular duties, Relator Jerczyk has access to a **UHC** national database, known as the "PCL CR" database, in which the details of individual member complaints against individual **UHC** Sales Agents are recorded along with the outcome as determined by the **UHC Compliance Department**.

111.     Further, **UHC** regularly sends "PCL CR" reports with aggregate PCL complaint data, typically in 10-day snapshots, to all Sales Managers, including Relator Jurczyk.

112.     In addition, from time to time, as part of his regular duties, Relator Jurczyk serves on Disciplinary Action Committees, which are discussed in detail below.  In this capacity, Relator Jurczyk has access to **UHC** beneficiary complaint databases, complaints, procedures and outcomes.

113.     As a result of his role in the investigative and disciplinary process and his access to **UHC's** national complaints databases, Jurczyk has direct, personal knowledge of dozens of cases in Wisconsin alone in which customer complaints raising serious compliance issues were routinely "determined" and falsely documented as either "*inconclusiv*e" or "*unsubstantiated* " by the **UHC Compliance Department.**

114.     As part of his duties, Jurczyk has access to data UHC conceals from CMS in its fraudulently concealed dual complaint data base.

115.     On the basis of either an "*inconclusiv*e" or "*unsubstantiated* " determination by **UHC**, in accordance with **UHC's** internal procedures, but not in accordance with CMS's contractual requirements, **UHC** omits from its self-reported data to CMS and entirely conceals from CMS to exclude from CMS's calculation of **UHC's Star Ratings** the data in its internal complaint data base to which Jurczyk is privy as part of his duties.

116. In his role, Relator Jurczyk has access to both of **UHC's** dual Complaint databases maintained by the **UHC Compliance Department** on the corporate level: 1) the accurate one with a complete list of complaints and more details of the offenses; and 2) the fraudulent truncated one provided to CMS. Both data bases are more fully described in the Fraudulent Conduct section below.

### 2. James Mlaker

117. Relator **James Mlaker** received his Bachelor of Arts degree in Psychology from the University of Wisconsin-Milwaukee in 1980 and a Master of Science in Professional Counseling from Concordia University of Wisconsin in 2004.

118. Prior to commencing his employment with **UHC**, Mlaker worked as a Medicare Sales Representative for iCare from 2010 to 2011, selling specialized plans to individuals eligible for both Medicare and Medicaid. From 2004 to 2010, Mlaker was a self-employed, Wisconsin-licensed, independent insurance broker selling a variety of Medicare Advantage plans to government beneficiaries.

119. Based on his prior experience selling managed care plans and his current employment at **UHC**, Relator Mlaker has specialized knowledge of how managed care organizations function and the regulations that govern them and their Medicare Advantage plans.

120. Relator Mlaker works for **UHC** as a Medicare Sales Representative at UHC's Wisconsin location in the Community and State Division, as he has since September 2011.

121. In his position at UHC, Relator Mlaker's direct supervisor is Relator Jurczyk.

### 3. Relators' Discovery of the Fraud.

122.    Both Relators first grew concerned about a **UHC** reporting fraud scheme in early 2013 after **UHC** transferred the majority of compliance responsibilities and processes for customer complaints regarding **Medicare Advantage** plans administered by Relators' division, **Community & State**, to the **Medicare & Retirement Division**.

123.    After **UHC's** transfer of its **Compliance Department** to the larger **Medicare & Retirement Division** in early 2013, Relators almost immediately began noticing that serious customer complaints that would have triggered a more intensive investigation under the **Community & State Division**, were now being treated in a completely different and fraudulent manner in order to disguise violations in an attempt to justify withholding information from CMS by maintaining a dual set of databases for its complaint investigation process and concealing the majority of the complaints in the separate database.

124.    Relators observed that after the shift in the reporting structure for the **Compliance Department,** complaint investigations that would have been completed swiftly were now drawn out; little actually inquiry was made or, even worse, known facts were ignored and discounted to falsify findings.  Further, Relators became aware that complaint investigations now resulted in much fewer and less serious corrective or disciplinary actions.

125.    With the transfer of **Community & State Division's** compliance investigations to the **Medicare & Retirement Division**, Relator Jurczyk gained access to a dual set of books for compliance findings. As Relators continued to observe an increasingly clear pattern of intentionally ineffective compliance investigations throughout late 2013 and early-to-mid 2014, Relators Mlaker and Jurczyk began analyzing the aggregate PCL customer complaint data and ultimately concluded in late 2014 or early 2015 that approximately 84% of complaints alleging *major* infractions, such as forging customer signatures on enrollment forms, were routinely

31

emerging from the Medicare & Retirement Division Compliance Department as "inconclusive" or "unsubstantiated" without any individualized explanation.

126.    Relators' fraud concerns grew when they noticed patterns in the types of complaints being "dismissed," as well as the scant, uniform nature of the justifications being offered in support of the dismissals.

127.    Further, complaints alleging major infractions had a disproportionate rate of "inconclusive" or "unsubstantiated" determinations, and the stated basis for such determinations was often merely that the agent had been "unable to contact the member."

128.    Finally, it became clear that **UHC's** compliance department was engaged in a systematic scheme to conceal serious customer complaints after personally.  Relators personally observed documented evidence supporting the merits of serious complaints which, as illustrated in examples listed below, once transferred to the **Medicare & Retirement Division** compliance process, shockingly emerged from the compliance investigation as a "unsubstantiated" or "inconclusive."

## VII.    FRAUDULENT CONDUCT

### A. UnitedHealthcare's Fraudulent Scheme to Conceal Data to Obtain Underserved Quality Bonus Payments and Avoid Penalties.

#### 1.  Fraud Summary.

129.    In order to maximize and maintain its **Quality Bonus Payments** and avoid penalties, **UnitedHealthcare Services, Inc.** has, since 2012, engaged in a fraudulent scheme to increase and maintain its lucrative **Star Rating** levels, to obtain the highest possible government payments.

32

130.     **UHC** implemented its scheme by creating a fraudulent compliance investigation and reporting process based on **UHC's** knowledge of how *material* its self-reported data in complaint categories is to CMS' determination of the **Star Rating** levels for purposes of the **Quality Bonus Payment** incentive program and to avoid penalties.

131.     **UHC** incentivizes its Sales Managers and higher level managers to assist in the **UHC** scheme to falsify compliance data and conceal fraud, forgery, and other egregious conduct by its sales force by creating a compensation scheme based on sales results that are impacted by **Star Ratings**.

132.     The fraudulent data is the result of a company-wide scheme facilitated by complaint investigation procedures designed to conceal from the government valid complaints raised by customers regarding serious marketing violations, including allegations of **UHC** insurance agents forging customers' signatures on enrollment forms.

133.     Indeed, **UHC** created a Compliance manual that specifically flags complaints that would, if reported, constitute "Risk to Consumer/Enrollee," actually meaning risk to the **UHC Quality Bonus Payments**, just as **UHC** had warned the public and its shareholders in its 10-K filing with the United States Securities and Exchange Commission ("SEC").

134.     The number, findings and disposition of beneficiary complaints **UHC** shares with CMS is truncated, with the full results concealed in a second database.

135.     In addition, **UHC** operates a *fraudulent investigation scheme* in violation of its obligations to CMS pursuant to the **Star Rating** system.

136.     **UHC** created and maintains a scheme to falsify data submitted to CMS for calculation of the number of customer complaints about its Medicare Advantage plans as well as

its overall compliance with **Medicare Advantage** regulations, two of the measures that

determine Defendant's **Star Rating** for its **Medicare Advantage** plans.

### 2. Importance of Concealed Data and Complaint Investigation Process to CMS' Star Ratings and Penalties.

137.     The data Defendant falsifies is (1) the number of customer complaints about the

plans per 1,000 members; and (2) the severity and validity of those complaints. CMS uses

precisely this data to calculate the **Star Rating** measures labeled "**Complaints about the Health**

**Plan**" (C26) and "**Beneficiary Access and Performance Problems**" (C28) ---- two of the

crucial measures for which CMS has significantly penalized some of Defendant's competitors,

including Cigna and Humana.

138.     Although these compliance measures only constitute 2 of the 32 Part C plan

measures numerically, compliance with regulations intended to protect against fraud and abuse

remains an underlying theme of the Affordable Care Act's reformulated **Medicare Advantage**

plan funding provisions as well as an overarching benchmark of the **Star Rating** incentive

program to pay **Quality Bonus Payments**. CMS, Medicare 2016 Part C & D Star Rating

Technical Notes, 3 (April 5, 2016); Memorandum from Jennifer Shapiro, CMS Acting Director,

to All Medicare Advantage Organizations and Part D Plan Sponsors (March 8, 2016) available at

http://benefitslink.com/src/cms/CMS-ratings_memo-03082016.PDF (discussing CMS's policy of

downgrading MA contracts' Star Ratings to 2.5 when plans are sanctioned for non-compliance);

see generally CMS, Summary of Comments to the [2015] Star Ratings Request for Comments,

(2014), *available at* https://www.cms.gov/ medicare/prescription-drug-

coverage/prescriptiondrugcovgenin/downloads /2014starratings requestforcomments112213-.pdf

34

(discussing importance of "data integrity" and problems that with "plan-reported data" that does not "represent the contracts' actual processes.")

139.     Pursuant to its broad authority under 42 C.F.R. § 422.516, CMS regularly collects compliance data from Medicare Advantage Organizations and requires them to have "an effective procedure to develop, compile, evaluate, and report information to CMS in the time and manner that CMS requires." CMS, Medicare Part C Plan Reporting Requirements Technical Specifications Document Contract Year 2016, January 1, 2016, 23-26, available at https://www.cms.gov/Medicare/Health-Plans/HealthPlansGenInfo/Downloads/2016-Part-C-Reporting-Requirements-Tech-Specs7252016-v02.pdf (hereinafter "**Contract requirements**")

140.     This compliance data includes *descriptive customer complaint data* as part of CMS's "need to monitor agent complaints to determine if Organizations are investigating identified complaints and imposing disciplinary actions as well as reporting poor conduct to the state." CMS, Medicare Part C Plan Reporting Requirements Technical Specifications Document Contract Year 2016, January 1, 2016, at page 23.

141.     "Complaints include both complaints from the Complaint Tracking Module and other complaints or grievances made directly to the Organization." CMS, Medicare Part C Plan Reporting Requirements Technical Specifications Document Contract Year 2016, January 1, 2016, at page 23.

### 3. To Foster its Scheme of Concealment, UHC Steers Beneficiary Complaints to Itself, Rather than to CMS or State Insurance Commissioners.

142.     Beneficiaries may make complaints about a Medicare Advantage plan directly to CMS or a state Insurance Commissioner.  When beneficiary complaints are sent directly to CMS, CMS forwards the complaint to the Medicare Advantage Organization for processing and

35

reporting back. In this way, CMS is first aware of the beneficiary complaint and will expect its disposition to be in the compliance self-report made by the Medicare Advantage Organization and submitted to CMS. Obviously, it is more difficult to go undetected by CMS to flagrantly omit such a complaint from a self-report due to CMS' initial knowledge of the complaint. In addition, it is also be more difficult to white-wash complaints initiated with CMS since a CMS audit may detect improper complaint processing of complaints about which CMS has knowledge.

143. As part of its fraudulent scheme, **UHC** designs its beneficiary communications program to reduce beneficiary complaints made directly to CMS. And, for the most part, **UHC** has succeeded in steering the vast majority of beneficiary complaints directly to the **UHC** itself whose lucrative **Quality Bonus Payments** are dependent in material part on having few, if any, substantiated serious complaints.

144. To accomplish nearly exclusive direct complaint reporting to itself, **UHC** does not provide beneficiaries with any salient information about contacting either CMS or state insurance regulators.

145. Instead, **UHC** highlights to its customers how to contact **UHC** itself to lodge a complaint with its in-house complaint processing department. This information is contained in **UHC's** insurance products information. Further, **UHC** is the only point of contact for most government beneficiaries with their Medicare Advantage plan or with any knowledge of **UHC's** plans and sales tactics.

### 4. The CMS Investigation Process Summary.

146. When government beneficiaries file a complaint with **UHC** about a Medicare Advantage plan, Defendant's Compliance Department within its Medicare & Retirement

36

Division conducts an internal "investigation." The investigation concludes with the complaint being internally labeled as 1) *inconclusive*, 2) *unsubstantiated*, or 3) *substantiated*.

147.    When a complaint is found to be either *unsubstantiated* or *inconclusive* by Defendant's Compliance Department, **UHC** omits it entirely from its self-reported data to CMS. In that way, such a complaint does not negatively impact the plan's **Star Rating** or potentially subject the plan to sanctions.

148.    Defendant's fraudulent scheme focuses on fraudulently labeling nearly all serious complaints as either *unsubstantiated* or *inconclusive* and not forwarding or making them available to CMS, thereby excluding them from the Complaints About Health Plan Star Rating measure, Beneficiary Access and Performance Problems measure, and compliance audit data required and collected by CMS.

## B.  UnitedHealthcare's Compliance Program Design

149.    In accordance with Section 1852(f) of the Social Security Act, **UHC**, like every Managed Care Organization that contracts with Medicare, has an internal compliance department with processes intended by CMS to ensure compliance through investigations of alleged infractions or grievances pursuant to 42 C.F.R § 564.

150.    UHC Regional Sales managers report compliance issues to **UHC's Corporate Compliance Department** at **UHC's** corporate headquarters in Minnetonka, Minnesota, which is identically organized according to the four sales divisions described above. UHC's Corporate Compliance Department is ultimately responsible for the design and maintenance of the uniform compliance procedures followed by its network or regional subsidiaries,who rely on national, system-wide databases also designed and maintained by UHC corporate.

151. **Jennifer O'Brien** is **UHC's Medicare & Retirement Division** Chief Compliance Officer.

152. **Christopher Zitzer**, an attorney, is the **UHC Community & State Division's** Vice President and Chief Compliance Officer.

153. **Sheila Chaffee**, **UHC**'s Vice President of Sales, Policy, & Oversight, supervises multi-regional teams of lower-level Medicare & Retirement compliance officers who conduct the compliance investigations. Chaffee often serves as the chairperson for Disciplinary Action Committees.

154. **Jeffrey Jost**, **UHC's** Vice President and Sales Policy and Oversight Director of Agent Complaints for the corporate Medicare & Retirement Division, assists in the management of the **Disciplinary Action Committee** described below.

155. In addition, **Michael Yasi**, **UHC's** Regional Sales Director for UHC's Community & State Division sales teams in Wisconsin, Texas, New Mexico and Ohio, participates in the Disciplinary Action Committee ("DAC").

156. Compliance "infractions" range from less egregious enrollment errors and omissions, sometimes raised by co-workers, to agents having unauthorized contact with potential customers and even more egregious to outright application forgery. Beneficiary complaints range from complaints about coverage determinations or customer service to complaints that raise serious compliance issues, including marketing misrepresentations and forgery.

**C. UHC's Complaint Processing.**

38

157.     When **UHC's** Compliance Department receives a complaint, it is assigned a "coaching request" number and an investigation is opened.

158.     The **UHC** complaint investigation is then conducted by a member of either the **Agent Complaint Tracking Team** or the **Compliance Investigation Unit Team** ("**CIU**"), depending on the type of complaint. Generally, the **Complaint Investigation Unit** handles complaints alleging regulatory violations, which are the subject of **UHC's** fraudulent scheme.

159.     **UHC** organizes complaints into six (6) allegation "families":

    (1) Lead/Contact Issues;

    (2) Prohibited Activities;

    (3) Risk to Consumers/Enrollees;

    (4) Operational Behavior;

    (5) Plan and Product Knowledge Issues; and

    (6) Point of Sale Issues.

160.     Allegations of forgery and other illegal ways of obtaining enrollee signatures are expressly listed in **UHC's** compliance procedure materials as examples of allegations that **UHC** includes in its "Risk to Consumers/Enrollee" complaint family and which is compliance and investigation employees are advised to whitewash as more fully described below.

**D.  Complaint Investigation**

161.     If the complaint is assigned to the **Compliance Investigation Unit**, the Unit begins its investigation by requesting a response from the sales agent, known as a "Request for Agent Response."

162.    The Request for Agent Response ("RAR") is a self-reporting questionnaire to be completed by the sales agent within five (5) days.  It requires the agent to give basic information regarding the time, place, and nature his/her interactions with the complainant beneficiary.

163.   For customer complaints forwarded to **UHC** from CMS, after receiving the Agent's response, the individual Compliance Investigation Unit investigator continues the investigation pursuant to CMS's "Standard Operating Procedures" Complaint Tracking Module for handling complaint investigations. Under the Standard Operating Procedures, further investigation includes "contacting the beneficiary if additional information is needed." Amy K. Larick, CMS, "*Complaint Tracking Module (CTM) Enhancements, Casework Reminders, Updated Standard Operating Procedures (SOP) and Other Helpful Information*" (Dec. 30, 2015) *available at* https://www.capstoneperformancesystems.com/wp-content/uploads/HPMS-Memo_CTM_SOP-UPDATE-12-30-2015.pdf

### E.  Self-Reporting to CMS

164.    *For substantiated beneficiary complaints only*, **UHC** self-reports to CMS for use in CMS's calculations of **UHC's** plan's **Star Ratings** either through the **Compliance Tracking Module** or through CMS's **Medicare Advantage Plan Reporting Requirements.**

165.    Once the complaint is fully considered and/or investigated, **UHC corporate** Compliance and Sales Management review the allegation, the investigation outcome, and the final determination with the agent. **UHC** refers to this process as the "**progressive disciplinary engagement**" process, potentially resulting in (1) assignment of applicable remediation modules, (2) assignment of outreach materials or training, (3) additional evaluations or compliance officer field observations or "ride-alongs"; (4) *formal acknowledgement of the complaint*; and/or (5) termination.

40

166.     In order to avoid reduction and to maintain the highest **Star Rating**, **UHC's** complaint investigation process is structured so that "formal acknowledgment of complaint" is merely one of five (5) possible outcomes of a **Compliance Investigation Unit** ("CIU") investigation.  That is, a complaint may be found worthy of a Corrective Action Referral, such as A ride-along, additional coaching and training, or even referral to a "Disciplinary Action Committee" and ultimately termination, but nonetheless be labeled as "*unsubstantiated*" or "*inconclusive*" and omitted from the **Complaint Tracking Module** data reported to CMS and entirely concealed from CMS.

167.     Thus, **UHC's** compliance investigation procedure facilitates its corporate scheme to conceal complaint data so it is not auditable by CMS by institutionalizing the treatment of even "*serious*" complaints as if they never occurred, once they are rubber-stamped as *inconclusive* or *unsubstantiated*.

168.     Neither the more informal "coaching processes" nor the formally convened **Disciplinary Action Committees** ("DAC") actually address the substantive merits of complaints or the adequacy of the complaint investigation. Indeed, it is not uncommon for managers, including Relator Jurczyk's own direct supervisor, **UHC Community &State Division** Chief Operating Officer for UHC's  Wisconsin sales region **Ralph Beck**, to dictate to sales managers, the language to be entered into **PCL CR** intended to document complaint-related compliance "coaching" that never actually occurs.

169.     Likewise, the results and "deliberations" of **Disciplinary Action Committees** ("DACs") are, as described in detail below, similarly predetermined and fraudulently meaningless. In short, the myriad steps, categories, and processes that constitute **UHC's** complaint investigation system are intended only to create the *appearance* of a diligent

41

compliance process. In reality, it is **UHC's** corporate need for the highest level of **Star Ratings** and enrollment profits that drives complaint investigation decision making.

170.    The **Disciplinary Action Committee** is comprised of **UHC** Investigators and upper-level management, including **UHC** Regional Sales Managers **Michael Yasi** w;r, **Jeffrey Jost**; **UHC's** Vice President and Sales Policy and Oversight Director of Agent Complaints and other **Compliance Department** managers who convene to determine what action, if any, is required regarding the outcomes of complaint investigations and compliance concerns.

171.    From time to time, as a Sales Manager, Relator Jurzcyk is directed to participate in **Disciplinary Action Committee** proceedings in addition to his ancillary "coaching" role in the compliance process.

172.    **Yasi's** compensation, and the compensation of other **Disciplinary Action Committee** members and their superiors, is directly related to the enrollment production of the Agents they oversee, including high performing agents, who, because of more "aggressive" sales tactics, are much more likely to have complaints filed against them and be subject to **Disciplinary Action Committee** review.


**F. United's Falsification of Star Rating Data Submissions**

173.    **UHC**, through its subsidiaries and **Medicare & Retirement Division Compliance Department**, has since 2012 submitted fraudulent customer complaint data to CMS, concealed other complaint data from CMS, and falsified complaint documentation submitted to CMS.

174.    CMS relied both directly and indirectly on the accuracy of the data in determining the amount of incentive payments to be paid by the CMS to **UHC** *in exchange for the very thing*

42

*the fraudulent data was intended to reflect*—increased quality of **UHC's** Medicare Advantage Plans, including a lack of serious complaint and a strong complaint investigation and agent disciplinary process.

175. The data is materially fraudulent not only because it falsely omits *and conceals* data specifically required by CMS as part of **Star Rating** calculation, but also because the specific types of complaints being concealed—the use of **forgery** and **kickbacks** to obtain enrollment— are the most serious and by themselves would have resulted in an intermediate sanction and, until recently, the **automatic reduction** of their Star Rating and loss of billions of dollars in government payments.

176. By the start of 2013, the primary investigation and decision-making processes for handling customer complaints were transferred from the **Community & State's Division Compliance Department** to the larger **Medicare & Retirement Division Compliance Department.**

177. Around the same time in early 2013, CMS stopped requiring **UHC** to conduct "outbound verification calls," or calls intended to confirm that recently enrolled Medicare Advantage plan members, had, in fact, intentionally enrolled. In other words, the calls were intended to catch and prevent fraudulent sales tactics, such as forgery.

178. As introduced above, **UHC** organizes complaints into six (6) categories. Two of these categories, **"Prohibited Activities"** and **"Risk to Consumers"** (hereinafter "**major complaints**") constitute the most serious types of allegations, including:

>    a.   Forgery or Deceitful Signature Request: enrolling a customer without their consent;

b.   Compensation to Induce Referrals / Kickbacks: offering gifts or payment to consumers in exchange for referrals or enrollment;

c.   Intimidating Sales Tactics: telling consumers that the plan is popular, scaring customers into buying plans, or refusing to leave a consumer's home;

d.   Cross-selling: selling a non-health-related product at a Medicare Advantage sales meeting.

179.   These **major complaints**, like all other complaints that **UHC** receives, are recorded in *dual databases.*  The first is the **Sales Management Reporting Tools** software, or "**SMRT**" system internal report that is available only to upper level corporate compliance and management personnel, including Relator Jurczyk. The more generally accessible **Producer Contact Log – Coaching Request**s, or **PCL CR** database, is accessible to all sales managers, including Relator Jurczyk.

180.   While the **SMRT** database includes complaint data prior to the conclusion of the investigations of the complaints, both databases purport to include all complaints once the investigations have been concluded, along with the names of the agent and member, the date of the complaint, a paragraph description of the allegations, and the ultimate finding.

181.   Upon analyzing monthly internal **SMRT** data, Relators discovered an alarming, statistically significant disparity between the high rate at which **major complaints** were found *inconclusive* or *unsubstantiated* and the comparatively low rate at which allegations of less egregious conduct were dismissed.  This was particularly striking due to the contrast in the finding pattern when the investigations had been conducted within the **Community & State Division**.

44

182.    For example, from September 2015 through March 2016, **major complaints** were found *inconclusive* or *unsubstantiated* an average rate of 83.78% of the time. In sharp contrast, the average monthly complaint dismissal rate for non-major complaints was just 10.85% during the same period.

183.    A month-by-month study of nationwide UHC complaint investigation outcomes for the period September 2015 through March 2016 resulted in the following tracking shown in graph form:



184.    Unable to obtain an explanation for the unusual data that was at odds with his own experience with complaint investigations in the **Community & State Division Compliance**

Case 2:16-cv-01429-WED   Filed 10/24/16   Page 45 of 54   Document 1

**Department**, Relator Jurczyk reviewed the data within the internal **SMRT** database and compared it with the data reported to CMS from the **PCL-CR** database.

185.     The internal database, or **SMRT** database, contains the *true and actual* complaint data that is now routinely concealed from rather than submitted to CMS for use in the CMS **Star Rating** calculations. *Specifically, the **SMRT** database contains hundreds of additional **major complaints** that are omitted completely from the **PCL-CR** report used to submit complaint investigation findings to CMS.*

186.     For example, the **PCL CR** database report for March 2016 alone reflects a total of approximately 257 complaints, whereas the **SMRT** database reflects that in reality **UHC** received a total of 771 complaints in March 2016 or about three (3) times more actual complaints than complaints submitted to CMS. Likewise, PCL CR report data for June 2016 indicates a total of 257 complaints when in reality UHC received 502 complaints according to SMRT.

187.     **UHC** restricts access to the **SMRT** database to its upper management.  Lower level employees reviewing only the more generally accessible **PCL** database would expect that all 771 complaints would have been included in **UHC's** self-report to CMS for purposes of calculating the **Star Rating** for **Quality Bonus Payments**.

188.     To further conceal the full information in the **SMRT** database, UHC prevents downloading of the complete data, even for those upper level managers who have full access to the electronic records.

**G. Specific Examples: UnitedHealthCare's Scheme to Conceal "Serious Compliance Issues" Including Violations of Medicare Advantage Enrollment and Marketing Regulations.**

189.     In addition to their analysis and personal observation of **UHC's** falsified complaint data, Relators Jurczyk and Mlaker have personal knowledge of specific, individual

46

complaints and investigations which, despite documented evidence, were ruled *inconclusive* or *unsubstantiated* in order to (1) conceal the complaints from CMS for purposes of maintaining high **Star Ratings**; 2) avoid potential penalties; and (3) retain noncompliant but, in many cases, highly productive sales agents.

### 1. Agent Joseph Medinger

190.    Internal **UHC** agent Joseph Medinger has received dozens of complaints from customers who accuse him of conduct falling into the **major complaint** categories, including three (3) within seven (7) months for "Enrollee does not recall enrolling" (CIU case #94375, May.12, 2016); "Forgery" (CIU case #85955, October 12, 2015); and "Forgery/Enrollee does not recall enrolling" (CIU case #85812, Oct. 2, 2015).

191.    All three (3) of these customer complaints about UHC Internal Agent Medinger, were found to be "*inconclusive*" or "*unsubstantiated*" ostensibly as a result of the investigator's inability to contact the complainant customer who had made the complaint in the first place.

192.    However, Relators have personal knowledge that in the case of Medinger, an Agent with a long history of serious complaints, the "inability to contact complainant" excuse, even if true, could not reasonably have supported an *inconclusive* or *unsubstantiated* finding in light of other evidence about which Relators as well as managers involved in the "investigation" were aware.

193.    Specifically, in Medinger's case CIU #85955, a complaint issued October 23, 2015 by a member who did not recall enrolling the UHC "Dual Complete HMO" Medicare Advantage plan, Medinger *admitted* in his Agent responses that he "completed the application for her [the government beneficiary] via [his] computer" and supposedly "filled it out" based on her verbal confirmation" despite the fact it was illegal for the plan in question to be completed

47

over the phone in the manner Medinger described. Further, Medinger did not obtain the complainant beneficiary's signature on the Medicare Advantage application.

194. As Medinger's case #85955 proceeded through **UHC's** investigation process, the complaint was found "inconclusive" and assigned the status "pending-coaching" on November 30, 2015.

195. On June 22, 2016, Relator Jurczyk was directed by **Jost**, **UHC's** Vice President and Sales Policy and Oversight Director of Agent Complaints, to participate in a **Disciplinary Action Committee** regarding Medinger's case # 85955 and two other recent forgery complaints, cases #94375 and #85812.

196. Believing that one of the purposes of the **Disciplinary Action Committee** would be to determine whether the case was properly found *inconclusive* or *unsubstantiated*, Relator Jurczyk obtained access to the exhibits and findings from the prior investigation of the complaint.

197. Shortly after his appointment to these complaints on June 22, 2016 by **Jost**, Relator received an email from Regional Sales Manager **Yasi,** instructing and directing him on how to vote on the Medinger Disciplinary Action Committee. Specifically, **Yasi** wrote to Jurczyk:

> **"Confidentially, David,** *you need to push to see this most recent issue labeled and adjudicated as 'unsubstantiated.'"*

198. Relator Jurczyk's personal experience on **Disciplinary Action Committees** revealed that **Disciplinary Action Committees** have little to do with whether complaints are actually substantiated. Upper management makes those decisions. In fact, whether a complaint

Case 2:16-cv-01429-WED   Filed 10/24/16   Page 48 of 54   Document 1

is "substantiated" is not related to whether the Agent is disciplined. Rather, it governs what will be concealed from CMS.

199.     **UHC** directs its managers to make findings that **major complaints** are *inconclusive* or *unsubstantiated* and then conceal them from CMS. At the same time, **UHC** often actually takes corrective action, in effect following an internal course of conduct based on a *substantiated* **major complaint**; while in its dual database, concealing such finding from CMS. That is, **UHC** may act internally as if the complaints are substantiated for purposes of personnel coaching and discipline, but nonetheless allow the *inconclusive/ unsubstantiated* findings to remain in place for purposes of justifying their exclusion from CMS reporting, all in order obtain and maintain the highest possible **Star Rating** and corresponding **Quality Bonus Payments**.

200.     Additional similar examples involving specific cases of which Relators have personal knowledge further illustrate Defendant's Janus-faced compliance investigation scheme and its signature pattern of egregious conduct being acknowledged, but nonetheless officially ruled inconclusive or unsubstantiated and concealed from CMS.

### 2.  Agent Tina Corpron

201.     On March 17, 2016 Relator Jurczyk was assigned to conduct the preliminary investigation of **UHC** Internal Agent **Tina Corpron**. A **UHC Medicare Advantage** plan member had called **UHC** directly with questions about the iPad tablet the beneficiary maintained **Corpron** had promised the beneficiary in exchange for maintaining their **Medicare Advantage** plan.

202.     Relator Jurczyk's subsequent investigation, which primarily consisted of contacting the complaining beneficiary and other government beneficiary plan members targeted by **Corpron**, revealed that **Corpron** had indeed been engaged in a brazen kickback scheme,

promising and providing iPads to beneficiaries if they stayed with their plan for six (6) months, in order to boost her commission and overall sales performance.

203.     Relator Jurczyk ultimately learned that **UHC** terminated **Corporn**.  However, he was surprised to learn she *was not terminated for her kickback scheme.* Rather, **UHC** cited other, minor compliance infractions, such as "inappropriate broker behavior" as the reason for her termination.

204.     Despite the firing and the conclusive investigation of the IPad kickback scheme as a result of Relator Jurczyk's investigation, **UHC** management had determined the allegations "inconclusive" and then, pursuant to its internal system, concealed them from CMS entirely. Thus CMS was unable to audit the investigation process since it was not alerted to these **major complaints** at all.

### 3.  Agent Irving Steel

205.     Relator Mlaker, as a UHC Internal Agent, also has personal knowledge of several cases where his fellow Agents emerged inexplicably unscathed from the complaint investigation following serious and specific allegations of marketing violations which were subsequently verified, sometimes by agent admission, but concealed from CMS.

206.     For example, on October 17, 2012 Relator Mlaker sent an email memo to Relator Jurczyk to report a customer complaint / allegation of forgery by **UHC** Internal Agent **Irving Steel**.

207.     During an appointment with a newly dual-eligible customer on or just prior to October 17, 2012, Relator Mlaker found that the customer was shocked to learn that his past appointment with **Steel** had resulted in the beneficiary's enrollment in **UHC's** AARP Medicare Complete plan.  The customer specifically recalled telling **Steel** that he "was not interested and

50

did not want to enroll." When Relator Mlaker asked if the customer had signed anything and showed him a copy of the application form, the customer insisted that he "didn't sign anything."

208. This complaint against Agent **Steel**, as related by Relator Mlaker to his manager, Relator Jurczyk, made its way through the **UHC** compliance investigation process and, like the vast majority of other **major violations**, was "determined" to be *inconclusiv*e and would have thus been concealed from CMS in accordance with UHC's policy and practice.

209. With the 3:1 disparity between the overall complaints in the **SMRT** database compared to complaints in the **PCL CR** database for the same month of March 2016, they are a myriad of other complaint examples in which **UHC** constructively determined a **major complaint** substantiated for internal purposes, but unsubstantiated for purposes of the **UHC** CMS report for purposes of the **Star Rating Quality Performance Bonus**.

## VIII.  COUNTS

### A.  Count One

**False Claims Act, 31 U.S.C. § 3729(a)(1)(A)**
**Submission of False Claims for Bonus Payments**

210. Relators re-allege and incorporate by reference the above allegations as if fully restated herein.

211. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

212. The False Claims Act, at 31 U.S.C. § 3729(a)(1)(A), states that "any person who . . . knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval" is liable under the Act.

51

213.     By virtue of misrepresentations and submissions of non-reimbursable claims, Defendant knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment.

214.     The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendant because Defendant had as part of its scheme, concealed the data from CMS altogether, paid and continues to pay the claims without regard to the unknown and fraudulently concealed data.

215.     The concealed data was material to the government's calculation of **Star Ratings** for purposes of **Quality Performance Bonuses** and to avoid penalties.

216.     By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

217.     Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein.

## B.  Count Two

### False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
### Falsification of Material Star Rating Compliance Data

218.     Relators re-allege and incorporate by reference the above allegations as if fully restated herein.

219.     The False Claims Act, at 31 U.S.C. § 3729(a)(1)(B), states that "any person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable under the Act.

220.     By virtue of the acts described above, Defendant knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to false or fraudulent claims.

221.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendant, paid and continues to pay the claims that would not be paid but for Defendant's illegal conduct.

222.    The Government, unable to audit the complaint process and findings of **UHC's** Compliance Department because of **UHC's** concealment, was defrauded by **UHC** in the calculations of the **Star Rating**.

223.    By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

224.    Additionally, the United States is entitled to the maximum penalty for each and every violation alleged herein from Defendant.


## IX.    PRAYER FOR RELIEF

WHEREFORE, the United States is entitled to damages from Defendant in accordance with the provisions of 31 U.S.C. §§ 3729-3733, as amended, of which up to twenty-five percent (25%) must be paid to the *qui tam* plaintiffs, James Mlaker and David Jurczyk, as Relators, and such further relief as this Court may deem appropriate or proper.

AND WHEREFORE, Plaintiff Relators request that judgment by entered against Defendant, ordering that:

a.    Defendant ceases and desists from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*;

b.    Defendant pays an amount equal to three (3) times the amount of damages the United States has sustained because of Defendant's actions, plus a civil

53

penalty against Defendant of not less than $5,500 and not more than $10,781 for each violation committed on or before November 1, 2015; and not less than $10,781 and not more than $21,563 for each violation of 31 U.S.C. § 3729 committed after November 2, 2015 pursuant to §3729(a)(1) and 28 C.F.R. § 85.5 (effective August 1, 2016);

c. Plaintiff Relators be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d); and

d. The United States and Plaintiff/Relators be granted all such other relief as the Court deems just and proper.

**PLEASE TAKE NOTICE THAT THE PLAINTIFF/RELATOR DEMANDS THE ABOVE ENTITLED ACTION TO BE TRIED TO A 12-PERSON JURY.**

Dated this 24TH day of October, 2016.

**Cross Law Firm, S.C.**
Attorneys for James Mlaker and
David Jurczyk

Lawyer's Building
845 North 11th Street
Milwaukee, WI 53233                    By:    s/Nola J. Hitchcock Cross
Phone: (414) 224-0000                          Nola J. Hitchcock Cross
Fax: (414) 273-7055                            Wisconsin Bar Number: 1015817

                                               Mary C. Flanner
                                               Wisconsin Bar Number: 1013095

54